[Civ. No. 4821. First Appellate District, Division Two.—May 22, 1924.]

# STANDARD LIVESTOCK COMPANY (a Corporation), Respondent, v. THE BANK OF CALIFORNIA, NATIONAL ASSOCIATION (a Corporation), Appellant.

[1] LEASES — BREACH OF COVENANT OF QUIET ENJOYMENT — ACTION FOR DAMAGES—LIABILITY OF BANK—AGENCY—ABSENCE OF WRITTEN AUTHORITY OF AGENT.—In an action by a lessee against a bank for damages by reason of an eviction in alleged violation of a covenant of quiet enjoyment under a lease executed by an employee of the bank as lessor to the plaintiff, the bank cannot be held liable as an undisclosed principal under the covenants of warranty in said lease, in the absence of any written authority to said employee to act as its agent and execute the lease.

[2] MORTGAGES—LEASES.—Where a conveyance is treated as a mortgage, the mortgagee, not in possession, may not execute a lease.

[3] BANKS AND BANKING—LEASE BY NATIONAL BANK FOR PERIOD LONGER THAN FIVE YEARS—INVALIDITY OF.—By virtue of the provision of the National Bank Act that "no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years," a lease of lands for a longer period than five years by a national bank holding a conveyance thereof to secure a pre-existing debt is wholly void and of no legal effect. (On petition for hearing in supreme court, approval withheld.)

[4] ID.—SPECULATIVE CONTRACT BY NATIONAL BANK—RIGHT TO ENTER INTO.—Conceding that a national bank would have the right to take title to land for the purpose of protecting itself against loss, nevertheless, in so taking and holding the title, the bank is not entitled to enter into any speculative contract. (On petition for hearing in supreme court, approval withheld.)

[5] ID.—EXTENT OF POWERS OF NATIONAL BANKS.—The Revised Statutes, sections 5133, 5343, constitute the measure of the authority of national banks, and such banks cannot rightfully exercise any powers except those expressly granted, or such incidental powers as are *necessary* to carry on the national bank business. (On petition for hearing in supreme court, approval withheld.)

[6] ID.—LEASE BY NATIONAL BANK—COVENANT OF QUIET ENJOYMENT. The exercise of the alleged power of a national bank to enter

1. See 1 Cal. Jur. 729.
3. See 4 Cal. Jur. 174.

into a lease and insert therein a covenant for quiet enjoyment is not *necessary* to the transaction of a national bank business. (On petition for hearing in supreme court, approval withheld.)

[7] JUDGMENTS—RES JUDICATA—DEFENSE.—The rule that a judgment is conclusive, not only as to the subject matter in controversy in the action upon which it is based, but also in all other actions involving the same question, and upon all matters involved in the issues which might have been litigated and decided in the case, the presumption being that all such issues were really met and decided, applies to matters both in respect to those of claim and those of defense. (On petition for hearing in supreme court, approval withheld.)

[8] LEASES—FORECLOSURE OF MORTGAGE—PARTIES—SURPLUS FUND AFTER FORECLOSURE—FAILURE OF LESSEE TO CLAIM—BREACH OF COVENANT OF QUIET ENJOYMENT—SUBSEQUENT ACTION AGAINST ALLEGED LESSOR—RES JUDICATA.—Where a lessee, who was disturbed in its quiet enjoyment of leased premises by reason of the foreclosure of a prior mortgage thereon, was a party to the foreclosure proceedings, and was entitled to litigate in such foreclosure proceedings its claim against the surplus fund remaining after the foreclosure sale, but failed to do so, it cannot in a subsequent action recover damages for the breach of the covenant of quiet enjoyment against a bank which was alleged to have made the lease and which was also a party to the foreclosure proceedings; and the fact that said lessee does not seek general damages in such subsequent action, but merely special damages, does not better its condition. (On petition for hearing in supreme court, approval withheld.)

[9] ID.—CAUSES OF ACTION—SPLITTING OF—PARTIES.—The rule that a person having a cause of action may not voluntarily split it or so divide it as to make it the subject of two or more actions, remains the same, even though such person is involuntarily summoned into court and commanded to set forth his claim. (On petition for hearing in supreme court, approval withheld.)

---

(1) 7 C. J. p. 560, sec. 166; 27 C. J., p. 297, sec. 376.   (2) 27 Cyc., p. 1246.   (3) 7 C. J., p. 812, sec. 735.   (4) 7 C. J., p. 813, sec. 736.   (5) 7 C. J., p. 807, sec. 726.   (6) 7 C. J., p. 807, sec. 726.   (7) 34 C. J., p. 813, sec. 1231, p. 855, sec. 1266, p. 902, sec. 1312, p. 909, sec. 1322, p. 911, sec. 1322.   (8) 27 Cyc., p. 1794. (9) 1 C. J., p. 1106, sec. 276, p. 1108, sec. 278 (Anno.), p. 1111, sec. 285.

APPEAL from a judgment of the Superior Court of Mendocino County. R. L. Thompson, Judge Presiding. Reversed.

---

7.  See 15 Cal. Jur. 95, 156.
8.  See 15 Cal. Jur. 142; 15 R. C. L. 949.
9.  See 1 Cal. Jur. 369; 1 R. C. L. 341.

The facts are stated in the opinion of the court.

Thomas, Thomas & McCowen, Pillsbury, Madison & Sutro, W. P. Thomas, Hale McCowen, Frank D. Madison and Marshall P. Madison for Appellant.

Preston & Duncan for Respondent.

STURTEVANT, J.—For some years prior to August 9, 1917, L. B. McMurtry owned the Ridgewood Ranch, located between Willitts and Ukiah, in Mendocino County. Prior to that date the owner had become financially involved. He owed the First Federal Trust Company, on notes past due secured by mortgage on the ranch, over $85,600. At the same time he owed the Bank of California $52,500 on unsecured notes. Other creditors existed and were pressing their claims. On the date last mentioned McMurtry executed to William R. Pentz a grant, bargain and sale deed conveying to Pentz the entire title. At the same time Pentz executed a defeasance reciting that the deed was made as security for McMurtry's indebtedness to the bank and agreeing that the property should be reconveyed upon the payment of the indebtedness. Pentz was one of the assistant cashiers of the bank, and, it may be added, he was the brother-in-law of McMurtry. McMurtry received the defeasance but did not record it. The deed to Pentz was duly recorded. After these things had occurred B. P. Noonan and McMurtry discussed the making of a lease under the terms of which the entire ranch would be leased to Noonan except that McMurtry would reserve hunting and fishing privileges, the right to remove tanbark and also thirty acres on which stood the farmhouse occupied by McMurtry and his family. Before the lease was ready to be signed Noonan was informed of the deed to Pentz and was told by McMurtry that the lease could be drawn in Pentz's name and that Pentz would execute it. Accordingly the lease was so drawn. It was dated November 1, 1917, and by its terms it purported to lease the lands from December 1, 1917, to June 1, 1923. The rent provided therein was $5,000 per annum payable in semi-annual installments. Plaintiff paid the first two installments to Pentz and both were immediately turned over to McMurtry. Plaintiff

never paid any other installment of rent. No paper purporting to be an authority of agency to Pentz to execute a lease was executed by any person, natural or artificial. The lease as drawn up was presented to Pentz by McMurtry and was signed at his request. At the same time Pentz signed a consent to the assignment of the lease by Noonan to the plaintiff. On June 29, 1918, Noonan loaned McMurtry $10,000 and McMurtry agreed that said amount might be credited as rent on the lease. A paper to that effect was drawn up to be signed by Pentz, but Pentz refused to sign it. Nevertheless, the money was loaned to McMurtry. Respondent was in possession at all times after December 1, 1917. In November, 1918, McMurtry having failed to pay either principal or interest upon the notes held by the First Federal Trust Company of San Francisco, an action in foreclosure was commenced by that company and the action resulted in a judgment in favor of the mortgagee. In that action the plaintiff made McMurtry, his wife, Pentz, Noonan, Standard Livestock Company and others defendants. Pentz and the Bank of California appeared and answered and filed a cross-complaint. Noonan and the Standard Livestock Company appeared and filed an answer, and also an answer to the cross-complaint. After the court had entered its judgment a sale was had. After the sale and after certain objections had been heard and disposed of by the supreme court (*Sullivan* v. *Superior Court*, 185 Cal. 133 [195 Pac. 1061]), a writ of assistance issued and the Standard Livestock Company was, by the sheriff, physically put off the premises. Claiming that the Bank of California was the undisclosed principal of Pentz, and that the plaintiff had been evicted in violation of its covenant of quiet enjoyment, and that by reason of said eviction, the plaintiff had been damaged, the plaintiff commenced this suit to recover damages against the Bank of California. A trial was had in the lower court before the court sitting with a jury; the jury returned a verdict in favor of the plaintiff; judgment was entered accordingly, and from that judgment the defendant has appealed under section 953a of the Code of Civil Procedure. In view of the conclusions which we have reached, we do not find it necessary to discuss every point made by the appellant. The verdict of the jury implies that the jury found that

the lease was executed by the defendant. That implied finding has no competent evidence in the record to support it.

[1] As stated above, the record contained no evidence of a written authorization from any person, natural or artificial, authorizing Pentz to act as his agent and execute the lease. On its face the lease purports to be the lease of Pentz as lessor; however, it is the claim of the respondent that Pentz acted as the agent of an undisclosed principal, the Bank of California. Counsel do not cite authorities, and we know of none, that Pentz, by virtue of his office as assistant cashier, had authority to bind his principal, the appellant, by making a lease of the appellant's lands in his own name or in appellant's name. (14a C. J. 440.) It will be conceded that in many cases a person is entitled to prove that another is an undisclosed principal. However, in every case that proof cannot be made in exactly the same way. In some cases there is *"indispensable"* evidence which it is necessary to produce in order to prove the fact. "The law makes certain evidence necessary to the validity of particular acts, or the proof of particular facts." (Sec. 1967, Code Civ. Proc.) "No estate or interest in real property, other than for leases for a term not exceeding one year, . . . can be created . . . otherwise than by operation of law, or a conveyance or other instrument in writing, subscribed by the party creating . . . the same, or by his lawful agent thereunto authorized by writing." (Code Civ. Proc., sec. 1971.) "In the following cases the agreement is invalid, unless the same or some note or memorandum thereof be in writing, and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement, cannot be received without the writing or secondary evidence of its contents: . . . 5. An agreement for the leasing for a longer period than one year . . . ; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged." (Code Civ. Proc., sec. 1973.) The foregoing rules were of particular importance in the instant case. If it had not been that the law prescribed the particular kind of proof necessary to show the agency, if any, of Pentz, there was testimony offered which could have been used to support the contention of the plaintiff, and there was testimony offered which

could have been used to support the contention that Pentz was acting as the agent of McMurtry. But none of that evidence was in writing signed by the party to be charged and therefore it did not meet the calls of the statute. The statute of frauds above quoted was enacted for the purpose of removing from contest in the courts those very questions.

Still claiming that the lease was not its contract, the appellant claims that as it is a national bank it had no power under the provisions of the National Bank Act and the decisions of the federal courts, to make, and that it did not make or execute, the lease; and, in this connection the appellant claims that the rules defining and limiting its powers are to be found in the federal statutes as construed by the federal courts. To this point the respondent replies that even a national bank may accept a conveyance of land to secure an existing indebtedness. To that reply the appellant answers that, admitting for the sake of argument, that Pentz, acting for the bank, received the deed as a mortgage to secure the bank for the money already loaned, that then and in that event the lease was invalid whichever way one looks at it. **[2]** If the conveyance is treated as a mortgage manifestly a mortgagee, not in possession, may not execute a lease. And, although the appellant had a right to take a conveyance to secure a pre-existing debt, nevertheless lands so obtained may not be retained as an investment because the National Bank Act provides, "But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years." (Rev. Stats., sec. 5137.) Notwithstanding the above provision, the deed from McMurtry to Pentz was dated August 9, 1917, and the lease was dated November 1, 1917, and by its terms it did not expire until June 1, 1923—nearly a year after the time would have expired during which the bank was legally entitled to hold the title. If the bank could so transcend the provisions of the statute for the period of ten months, it could do the same thing for ten years, or any other period of time. In reply to this proposition it may be said that, conceding the lease was not valid for the full period of time for which it was written, that it would be a valid lease to August 9, 1922. But such a contention is not sound. **[3]** Such a lease is not

merely voidable but is wholly void and of no legal effect. (*Central Transp. Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 59, 60 [35 L. Ed. 55, 11 Sup. Ct. Rep. 478, see, also, Rose's U. S. Notes].) Being void, it is clear that the lease could not be valid for any length of time whatsoever.

[4] Moreover, conceding that the bank would have the right to take title to the land for the purpose of protecting itself against loss, nevertheless, in so taking and holding the title, the bank was not entitled to enter into any speculative contract. These contentions are supported by the provisions of the Revised Statutes and by the decisions hereinafter referred to. [5] The Revised Statutes, sections 5133, 5343 (U. S. Comp. Stats., sec. 9658; 6 Fed. Stats. Ann., 2d ed., p. 651; 7 Fed. Stats. Ann., 2d ed., p. 918), constitute the measure of the authority of national banks, and such banks cannot rightfully exercise any powers except those expressly granted, or such incidental powers as are *necessary* to carry on the national bank business. (*Logan County Bank* v. *Townsend,* 139 U. S. 67, 73 [35 L. Ed. 107, 11 Sup. Ct. Rep. 496, see, also, Rose's U. S. Notes]; *California Bank* v. *Kennedy,* 167 U. S. 362, 366 [42 L. Ed. 198, 17 Sup. Ct. Rep. 831].) It is not even contended that the Revised Statutes contain a clause authorizing a national bank to purchase land to secure itself from loss or otherwise, and thereafter execute a lease to the land and insert in the lease a covenant for quiet enjoyment as against the acts of those holding the paramount title. It is patent therefore that the bank did not have the express power. [6] It will not be disputed that the bank had every *necessary* incidental power to carry on a national bank business; but, it is hardly open to argument that the power to enter into a contract containing the covenant in question is not *necessary* to the transaction of a national bank business. It is patent that it is not *necessary.* National banks have been in existence in nearly every county in nearly every state in the Union for many years. The transactions of those banks have included the bulk of the business transacted in America. In preparing this case, although the attorneys on each side have been most industrious and have prepared most extensive and comprehensive briefs, neither counsel has been able to find a single case where a national bank had entered into such a contract. Not being contented with the search made by

counsel, this court has made an independent search and has not been able to locate a single case on the subject. We think that the absence of authorities, itself, lends much support to the proposition that the exercise of the alleged power in question is not *necessary* to the transaction of a national bank business. As was said by Mr. Dillon, "Any fair reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied." The reason for the restrictions on the powers of national banks was stated in *National Bank* v. *Matthews*, 98 U. S. 621 [25 L. Ed. 188, see, also, Rose's U. S. Notes]. At page 626 the court said: "The object of the restrictions was obviously threefold. It was to keep the capital of the banks flowing in the daily channels of commerce; to deter them from embarking in hazardous real estate speculations; and to prevent the accumulation of large masses of such property in their hands, to be held, as it were, in mortmain. The intent, not the letter, of the statute constitutes the law." The restrictions were again stated, the reasons were again given, and the right and duty on the part of the bank to plead, as a defense, its want of authority, were again repeated and summarized in *California Bank* v. *Kennedy*, 167 U. S. 362 [42 L. Ed. 198, 17 Sup. Ct. Rep. 831, see, also, Rose's U. S. Notes]. At page 367 the court said: "Whatever divergence of opinion may arise on this question from conflicting adjudications in some of the state courts, in this court it is settled in favor of the right of the corporation to plead its want of power, that is to say, to assert the nullity of an act which is an *ultra vires* act. The cases of *Thomas* v. *Railroad Co.*, 101 U. S. 71 [25 L. Ed. 950], *Pennsylvania Railroad* v. *St. Louis etc. Railroad*, 118 U. S. 290 [30 L. Ed. 83, 6 Sup. Ct. Rep. 1094], *Oregon Railway & Navigation Co.* v. *Oregonian Railway Co.*, 130 U. S. 1 [32 L. Ed. 837, 9 Sup. Ct. Rep. 409]; *Pittsburgh, Cincinnati etc. Railway* v. *Keokuk & Hamilton Bridae Co.*, 131 U. S. 371 [33 L. Ed. 157, 9 Sup. Ct. Rep. 770], *Central Transp. Co.* v. *Pullman's Palace Car Co.*, 139 U. S. 24 [35 L. Ed. 55, 11 Sup. Ct. Rep. 478], *St. Louis etc. Railroad* v. *Terre Haute & Indianapolis Railroad*, 145 U. S. 393 [36 L. Ed. 748, 12 Sup. Ct. Rep. 953], *Union Pacific Railway* v. *Chicago etc. Railway*, 163 U. S. 564 [41 L. Ed. 265, 16 Sup. Ct. Rep. 1173], and *McCormick* v. *Market Nat. Bank*, 165

U. S. 538 [41 L. Ed. 817, 17 Sup. Ct. Rep. 433], recognize as sound doctrine that the powers of corporations are such only as are conferred upon them by statute, and that, to quote from the opinion of the court in *Central Transp. Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 59, 60 [35 L. Ed. 55, 11 Sup. Ct. Rep. 478].

"'A contract of a corporation, which is *ultra vires,* in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it.'

"This language was also cited and expressly approved in *Jacksonville etc. Railway* v. *Hooper,* 160 U. S. 514, 524, 530 [40 L. Ed. 415, 16 Sup. Ct. Rep. 379, see, also, Rose's U. S. Notes].

"As said in *McCormick* v. *Market National Bank,* 165 U. S. 538, 549 [41 L. Ed. 817, 17 Sup. Ct. Rep. 433]:

"'The doctrine of *ultra vires,* by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: The obligation of anyone contracting with a corporation to take notice of the legal limits of its powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law. (*Pearce* v. *Madison & Indianapolis Railroad,* 21 How. 441 [16 L. Ed. 184, see, also, Rose's U. S. Notes]; *Pittsburg, Chicago etc. Railway* v. *Keokuk & Hamilton Bridge Co.,* 131 U. S. 371, 384 [33 L. Ed. 1579, 9 Sup. Ct. Rep. 770]; *Central Transp. Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 48 [35 L. Ed. 55, 11 Sup. Ct. Rep. 478].)'

"The doctrine thus enunciated is likewise that which obtains in England. (*Ashbury Railway Carriage & Iron Co.* v. *Riche,* L. R. 7 H. L. 653; *Attorney General* v. *Great*

*Eastern Railway Company,* 5 App. Cas. 473; *Baroness Wenlock* v. *The River Dee Company,* 10 App. Cas. 354; *Trevor* v. *Whitworth,* 12 App. Cas. 409; *Ooregum Gold Mining Co. of India* v. *Roper,* [1892] App. Cas. 125; *Mann* v. *Edinburgh Northern Tramways,* [1893] App. Cas. 69.)''

As showing how strictly the federal courts have ruled the questions concerning attempts on the part of national banks to exceed the powers conferred upon them, and as showing that the contract in the instant case was void, we call attention to the following additional cases:

In *Burrows* v. *Niblack,* 84 Fed. 111 [28 C. C. A. 130], the circuit court of appeals for the seventh circuit was called upon to consider a transaction in which the Chemical National Bank of Chicago attempted to purchase 100 shares of its capital stock from one of its stockholders. There was no claim that the stockholder owed the bank or that the purchase was made to protect the bank against a pre-existing debt. The trial court held that the purchase was invalid and that the receiver of the bank should have judgment for the moneys paid on the purchase. The circuit court of appeals affirmed the judgment.

In the case entitled *Edward P. Allis Co.* v. *Standard Nat. Bank,* 110 Fed. 47, the court was called upon to determine the liability of the defendant bank growing out of a contract made by the bank to save itself from loss on a pre-existing debt. The debtor became insolvent. To protect itself the defendant entered into a purported contract under which it attempted to join with others in operating a saw-mill that had formerly been operated by the debtor. Instead of collecting the debt of $15,000 it sunk $36,601 more, and the plaintiff claimed the right to recover yet other moneys. The court held that the defendant bank, even under the facts stated, had no power to carry out the terms of such a contract.

In the case of *Cooper* v. *Hill,* 94 Fed. 582 [36 C. C. A. 402], the circuit court of appeals of the eighth circuit had under consideration the act of a board of directors of a national bank in handling loans made to a mining company. The bank had loaned the company moneys and had thereafter obtained judgment in the sum of $4,500. The bank caused one of its directors, who was also cashier, to take and hold title to the mining claims. Thereafter the di-

rectors caused the accumulated waters to be pumped out of the mine and the mine to be thus placed in salable condition.  Other facts stated by the court are: "The unfortunate part of this case is that they did not stop here. When the shaft had been cleared of water and the machinery had been put in operation, when the property was in proper condition for examination and for sale, and when no purchaser was found, they proceeded to expend $18,864.82 more in prospecting for paying ore upon property in which none has ever been discovered.  It was not only beyond their authority as officers of the bank, but *ultra vires* of the bank itself, to carry on ordinary mining, manufacturing, or trading business—much more, to expend its money in such a speculative venture as prospecting for ore where none of value ever had been found."

 In the case of *First National Bank* v. *Converse,* 200 U. S. 425 [50 L. Ed. 537, 26 Sup. Ct. Rep. 306, see, also, Rose's U. S. Notes], the court was considering these facts: In May, 1884, the Northwestern Manufacturing and Car Company was a corporation engaged in the manufacturing business at Stillwater, Minnesota.  At the date mentioned the car company owed a large amount of debts which it was unable to pay, among which was a sum due to the First National Bank of Ottawa.  In the financial distress that followed the creditors, including the bank, formed the Minnesota Thresher Manufacturing Company and the bank took stock therein, exchanging its claim against the car company therefor. Later the thresher company became insolvent and the suit was brought to collect a stockholder's liability.  The thresher company inserted in its articles of incorporation that it was to purchase and hold the stock of the Northwestern Manufacturing and Car Company and that it was to manufacture and sell steam engines.  The court held that the business of the thresher company was speculative and then the court says: "To concede that a national bank has ordinarily the right to take stock in another corporation as collateral for a present loan or as security for a pre-existing debt, does not imply that because a national bank has lent money to a corporation it may become an organizer and take stock in a new and speculative venture; in other words, do the very thing which the previous decisions of this court have held cannot be done."

In *Merchants' National Bank* v. *Wehrmann*, 202 U. S. 295 [50 L. Ed. 1036, 26 Sup. Ct. Rep. 613, see, also, Rose's U. S. Notes], the court was considering these facts: A partnership 'had been formed to purchase, improve, divide in lots and sell a leasehold. The partnership was formed under the laws of Ohio and included forty shares, each of which was represented by a transferable certificate. The bank, to secure a pre-existing debt, took nine of the shares as security and afterwards became the owner of them in satisfaction of the debt. In the trial court it was found that the partners must contribute to pay the debts of the firm, and some of them being solvent the bank was charged with the full share of a solvent partner. The supreme court of Ohio held this to be wrong, but decided that the bank was liable for nine-fortieths of the debts. The supreme court of the United States considered the analogy between a corporation and the partnership and then, commencing at page 300, the court says: "But to take a share by transfer on the books means to become a member of the concern. The person who appears on the books of the corporation as the stockholder is the stockholder as between him and the corporation, and his rights with regard to the corporate property are incident to his position as such. (*National Bank* v. *Case*, 99·U. S. 628, 631 [25 L. Ed. 448, see, also, Rose's U. S. Notes]; *Pullman* v. *Upton*, 96 U. S. 328 [24 L. Ed. 818].) This does not matter, or matters less, in the case of a corporation, for the reasons which we have stated. But when a similar transfer is made of a share in a partnership it means that the transferee at once becomes a member of the firm and *goes into its business with an unlimited personal liability,* in short, does precisely what a national bank has no authority to do. This the supreme court of Ohio rightly held beyond the powers of the bank. (U. S. Rev. Stats., secs. 5136, 5137.) It is true that it has been held that a pledgee may escape liability if it appears on the certificate and books that he is only a pledgee. (*Pauly* v. *State Loan & Trust Co.,* 165 U. S. 606 [41 L. Ed. 844, 17 Sup. Ct. Rep. 465]; *Robinson* v. *Southern National Bank,* 180 U. S. 295 [45 L. Ed. 536, 21 Sup. Ct. Rep. 383, see, also, Rose's U. S. Notes]; *Rankin* v. *Fidelity Trust Co.,* 189 U. S. 242 [47 L. Ed. 792, 23 Sup. Ct. Rep. 553, see, also, Rose's U. S. Notes].) No doubt the security might be realized

without the pledgee ever becoming a member of the firm. It is not necessary in this case to say that shares like the present could not be accepted as security in any form by a national bank. But such a bank cannot accept an absolute transfer of them to itself. It recently has been decided that a national bank cannot take stock in a new speculative corporation, with the common double liability, in satisfaction of a debt. (*First National Bank of Ottawa* v. *Converse*, 200 U. S. 425 [50 L. Ed. 537, 26 Sup. Ct. Rep. 306, see, also, Rose's U. S. Notes].) *A fortiori,* it cannot take shares in a partnership to the same end.'' (Italics ours.)

The Revised Statutes provide that a national bank shall not ''transact any business, except such as is incidental and preliminary to its organization, until it has been authorized by the controller of the currency to commence the business of banking.'' Before receiving such authorization from the controller the Market National Bank of Chicago attempted to lease premises for its banking business. In an action brought to recover rent under that purported contract it was held that no recovery could be had. (*McCormick* v. *Market Bank,* 165 U. S. 538 [41 L. Ed. 817, 17 Sup. Ct. Rep. 433, see, also, Rose's U. S. Notes].)

It is quite impossible, after reading the foregoing cases, to form any other conclusion than this, that a national bank may not exercise any powers except those expressly granted or such incidental powers as are necessary to carry on the national bank business; that the supreme court of the United States has the power to examine into that question whenever it is presented; that the scope of such examination by that court extends to an examination not only of the contracts or purported contracts but of the statutes both state and federal which in any way enter into and form a part of the purported contract; that when from such an examination it appears that the national bank has entered into a contract in excess of its delegated powers and which in truth and in fact is speculative, that is, carries ''*an unlimited personal liability,*'' that then and in that event the supreme court of the United States will decline to uphold a judgment enforcing any liability against the bank. We think this lease must be so classified.

The appellant in its answer pleaded in bar the judgment in the foreclosure proceedings hereinabove referred to.

Thereafter on the trial of the case the issue as to the effect of said judgment was fully litigated. At this time the appellant claims that the verdict of the jury was against the law and the evidence because the judgment in the foreclosure proceeding was an absolute bar. The effect of that judgment was before the supreme court and that court fully expressed itself on the subject in *Sullivan* v. *Superior Court*, 185 Cal. 133 [195 Pac. 1061]. In that decision, among other things, the court said:

"No provision was made by this decree to protect the leasehold of the Standard Livestock Company, or for the application of any of the proceeds of the sale to its interest in the premises. The decree, however, directs if there remain any balance after applying the proceeds as therein specifically directed, the same 'be returned into court to abide the further order thereof.' . . .

"It seems to us that the main issue in this proceeding, namely, the right of the purchaser at this sale to possession of the entire interest and estate in these premises on receipt of his deed, freed from the leasehold or other subsequent interests, is not open to dispute. The decree was allowed to become final without appeal, motion for new trial, or other attempt to avoid or modify it. The owners of the leasehold were parties to the action. Their interest was declared subject and subordinate to plaintiff's mortgage. The entire interests covered by the mortgage and lease were subject to sale and ordered sold and foreclosed in satisfaction of plaintiff's claim. No provision was made for making this sale subject to the leasehold interest, and the court could no more have subordinated the rights of plaintiff to that of the lessees in making this sale than it could to the rights of the subordinate lienholders under subsequent mortgages. Each, in the order of preference of his claim, was entitled to redeem but no redemption was made. As to all lien claimants other than the plaintiff, the leasehold was decreed to be prior and superior, and the lessees should have been entitled to take precedence to these in the distribution of the surplus proceeds of the sale after plaintiff's demand had been satisfied. . . .

"We are satisfied that petitioner is entitled to possession of the premises *freed from the claims of this lease.*

"No judgment of court in ejectment or unlawful detainer could give him any clearer right to possession than he has under this judgment and sale. This is not a case where the rights of parties in possession who are not bound by the record in the foreclosure action are involved, and where an independent title or right of possession is claimed. Here the rights of the contenders for possession have been fully adjudicated and it only remains to put the plain provisions of such adjudication into execution." (Italics ours.) But the respondent contends all of that language is *obiter*. With this contention we do not agree. We think it was of the very essence of the *mandamus* proceeding that the supreme court should have ascertained whether the appellant had any rights that had not been litigated. In so ascertaining the supreme court used the language quoted. We have examined that language most carefully and do not find that the supreme court used a word as *obiter*. However, be that as it may, we still think that the language used was sound and that this court should follow it whether the language is *obiter* or otherwise. In 15 Cal. Jur. 136, sec. 189, it is said: "In the latter case (a judgment pleaded in bar) a final adverse judgment on the merits operates and is pleadable as a complete bar to the second action, regardless of what may or may not have been presented in support or defense of the claim in the prior action." (In *Crew* v. *Pratt*, 119 Cal. 139, at page 149 [51 Pac. 38, 42], the court said: "It may be stated as a general proposition, that a judgment is conclusive, not only as to the subject matter in controversy in the action upon which it is based, but also in all other actions involving the same question, and upon all matters involved in the issues which might have been litigated and decided in the case; the presumption being that all such issues were really met and decided." [7] The rule applies to matters both in respect to those of claim and those of defense. (*Estate of Bell*, 153 Cal. 331, 340 [95 Pac. 372].) In a case very similar in some respects to this case, the whole subject received careful consideration by the supreme court of New York. (*Pakas* v. *Hollingshead*, 184 N. Y. 211 [112 Am. St. Rep. 601, 6 Ann. Cas. 60, 3 L. R. A. [N. S.] 1042, 1045, 77 N. E. 40].)

[8] As stated above, when the Federal Trust Company commenced the action in foreclosure it made Pentz and the

Bank of California, and Noonan, and the Standard Live-
stock Company, parties defendant. When Pentz and the.
Bank of California appeared they filed an answer and cross-
complaint and made Noonan and the Standard Livestock
Company cross-defendants. Thereafter Noonan and the
Standard Livestock Company appeared and answered the
cross-complaint. They pleaded the lease *in haec verba,* but
they did not in their pleading set any value thereon, nor did
they make any attempt to have the trial court, in the fore-
closure proceeding, ascertain their damages and cause their
claim to be paid out of the surplus moneys after the fore-
closure sale had been held. In *Sullivan* v. *Superior Court,*
*supra,* the supreme court points out that fact and rests
its decision thereon. When this plaintiff was made a party
in the foreclosure proceeding it was entitled to come forward
and make its claim for damages for being disturbed in its
quiet enjoyment of the premises. In 27 Cyc. 1767 it is
said: "The surplus proceeds of a foreclosure sale, after
satisfying the mortgage debt, represent the equity of re-
demption and are constructively real property and belong
to . . . the owner of an interest, title, or estate in the
premises distinct from but superior to that of the mort-
gagor. . . . " The respondent says that it does not claim
that it had a lien and therefore that it had no standing in
the foreclosure proceeding to ask the trial court to make its
claim secondary to that only of the Federal Trust Company.
But it was not necessary that it should have a lien. It was
sufficient to give it a proper status that it was "the owner
of an interest, title, or estate in the premises" distinct from,
but superior to, that of the Bank of California. *Williams*
v. *Pratt,* 10 Cal. App. 625 [103 Pac. 151], rules the prin-
ciple. In that case the trustees, after exercising the powers
of sale under a trust deed, had a surplus of moneys in their
hands. The question before the court was as to who was
entitled to share therein. The appellant, Raymond, con-
tended that by reason of certain payments she had made on
an executory contract of purchase that she was entitled to
share in the fund. The trial court made no finding on her
claim. For that reason the judgment was reversed to en-
able the trial court to ascertain and protect the amount of
her claim. *Reed Orchard Co.* v. *Superior Court,* 19 Cal.
App. 648 [128 Pac. 9], also rules the principle. Condemna-

tion proceedings were commenced against the Reed Orchard Company, Komano and others. Komano did not, in his pleading, set forth the value of his alleged leasehold interest. In its verdict the jury did not ascertain or determine the value of said interest. Later Komano applied for a writ of *supersedeas* to protect his alleged rights. At page 661 the court said: "It would also seem clear that the defendants had the burden of alleging and proving their interests and the value thereof, and that only the defendant meeting that burden should be permitted in this proceeding to question the disposition of the fund. The People's Savings Bank and Komano having been regularly served with summons, and having failed to appear and urge any claim to whatever fund might be awarded, should not be indulged now to stay this public improvement on the ground that the jury did not find the value of an interest which was not alleged to have any value and did not award these defendants money which in the lower court they declined to claim. If the owner of a mortgage or of a leasehold interest can lie by in this way until after judgment and successfully interpose such an objection, it is manifest that fraud is likely to be encouraged thereby at the expense of the public welfare."

Several cases have been decided in New York which are directly in point. *Clarkson* v. *Skidmore*, 46 N. Y. 297, is probably the leading case. *Larkin* v. *Misland*, 100 N. Y. 212 [3 N. E. 79], is particularly in point. The defendant Agnes Misland complained regarding the report of a referee who did not report her rights in the surplus fund. On the hearing of the matter the lessee did not make any proof of the value of her leasehold interest. The court held that the special term was justified in ruling that the lessee had shown no loss by the extinction of her estate which should be compensated out of the surplus. In the case of *Title Guarantee & Trust Co.* v. *Twenty-first Street & Fifth Avenue Corporation*, 110 Misc. Rep. 126 [180 N. Y. Supp. 358], the court said: "Furthermore, where the breach of a covenant for quiet enjoyment is due to the foreclosure of a mortgage on the property, a tenant is entitled to recover substantial damages, measured by the value of the unexpired term, less rents reserved, and to look for reimbursement to the surplus moneys which may be realized on the foreclosure sale." In

the case of *Dorb* v. *Modern Folding Co.*, 183 N. Y. Supp. 639, 640, the court said: "The rule of damages in proceedings of this kind is clearly set forth by Judge Rapallo in the case of *Clarkson* v. *Skidmore,* 46 N. Y. 297. It was decided in this case that the measure of damages is the value of the use of the premises for the remainder of the term, less the rents reserved. The right of the lessee to the fund is paramount to the right of the owner of the equity of redemption. She is therefore entitled to a first lien upon the surplus fund." No case to the contrary has been cited to us, and we know of none. We think it is clear, therefore, that the respondent was entitled to litigate in the foreclosure proceedings its claim against the surplus fund, and having failed to do so that it may not now complain.

The fact that it does not seek general damages in this case, but merely special damages, does not better its condition. To hold otherwise would be in effect to hold that the respondent is entitled at will to split its cause of action. In the case at bar it is not even claimed that there was more than one breach of the covenant of quiet enjoyment. For that one breach the respondent was entitled to maintain one action and not several. (1 C. J. 1111, sec. 285; *Herriter* v. *Porter,* 23 Cal. 385, 387.) Its cause of action ripened and the respondent was entitled to sue thereon immediately after the foreclosure proceeding had been commenced and the respondent had been made a party thereto. (*McGary* v. *Hastings,* 39 Cal. 360, 367 [2 Am. Rep. 456]; *McAlester* v. *Landers,* 70 Cal. 79, 83 [11 Pac. 505]; *McCormick* v. *Marcy,* 165 Cal. 386, 389 [132 Pac. 449]; *Agoure* v. *Lewis,* 15 Cal. App. 71, 73 [113 Pac. 882]; *Sullivan* v. *Superior Court, supra.*) **[9]** It will not be contended seriously that when a person has a cause of action he may voluntarily split it or so divide it as to make it the subject of two or more actions. (1 C. J. 1106 and 1111.) The rule remains the same, even though such a claimant is involuntarily summoned into court and commanded to set forth his claim.

The judgment is reversed.

Langdon, P. J., and Nourse, J., concurred.

A petition by respondent to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 21, 1924, and the following opinion then rendered thereon:

THE COURT.—The application for a transfer and hearing by this court after decision by the district court of appeal is denied. We are satisfied with the conclusion reached by the district court upon the first question discussed in its opinion, namely, that the defendant bank cannot be held liable as an undisclosed principal upon the covenants of warranty in the lease executed by Pentz, in the absence of any written authority therefor. This conclusion is determinative of the case and renders unnecessary a consideration of the other questions discussed in that opinion. For this reason we neither approve nor disapprove what is said in that opinion upon the other two points discussed therein.

Lennon, J., Shenk, J., and Waste, J., concurred.