[Civ. No. 5239.   First Appellate District, Division Two.—October 21, 1925.]

## H. F. METCALF et al., Appellants, v. V. W. GUERCIO et al., Respondents.

[1] BROKER'S COMMISSIONS—PROCURING OF READY, ABLE AND WILLING LESSEE—UNDISCLOSED PRINCIPAL—STATUTE OF FRAUDS—EVIDENCE. In this action to recover a judgment for commissions alleged to have accrued in favor of plaintiffs in connection with the procuring of a lessee ready, able and willing to enter into a lease of defendants' real property for ninety-nine years upon the terms stated in plaintiffs' contract of employment, the evidence having shown that the person who purported to accept defendants' terms was merely acting as the agent of other persons, principals unknown to defendants, and there having been no writing executed by any of said principals authorizing said agent to do anything whatever, or any showing that plaintiffs had brought the lessors and a lessee to an agreement, or that an agreement had been executed which could be enforced by said principals, or by defendants against said principals, the trial court properly found against plaintiffs' claim that during the term of their contract they found

1.  See 4 Cal. Jur. 592.

a lessee ready, able and willing to execute a lease upon defendants' terms.

[2] ID.—ACCEPTANCE OF DESIGNATED LESSEE—UNDISCLOSED PRINCIPAL—ESTOPPEL—EVIDENCE—JUDGMENT—APPEAL.—On appeal from the judgment in favor of the defendants in such action, there was no merit in the contention that a certain letter written by defendants to plaintiffs (in response to the latter's advice that they had procured an acceptance of defendants' terms by a designated person), and wherein plaintiffs were directed to draw a lease and submit same to defendants for approval, was, in legal effect, an acceptance of said designated person as lessee and that defendants were estopped from thereafter asserting that said person was not ready, able, and willing to execute the lease, where the evidence showed that all parties knew that said person was not to be the lessee, but was merely acting as agent for other persons, principals unknown to defendants, and, furthermore, such contention was not presented in the trial court, but both parties proceeded to introduce evidence to the effect that said person was or was not ready, able and willing to execute the lease, and that he executed the purported acceptance contract as the agent of an undisclosed principal.

(1) 4 C. J., p. 731, n. 81, p. 775, n. 26; 9 C. J., p. 655, n. 43.
(2) 3 C. J., p. 718, n. 50; 21 C. J., p. 1123, n. 36, p. 1246, n. 33.

APPEAL from a judgment of the Superior Court of Los Angeles County. Albert Lee Stephens, Judge. Affirmed.

The facts are stated in the opinion of the court.

Goudge, Robinson & Hughes and F. Walton Brown for Appellants.

Page & Hurt and Eugene D. Williams for Respondents.

STURTEVANT, J.—The plaintiffs commenced an action against the defendants to recover a judgment for commissions alleged to have accrued in their favor. The action was tried before the judge of the trial court sitting without a jury. Judgment went for the defendants and the plaintiffs have appealed, bringing up the judgment-roll and a bill of exceptions.

In their complaint the plaintiffs alleged that the defendants authorized the plaintiffs to negotiate a lease of property owned by the defendants and which was situated at the

southwest corner of Grand Avenue and Sixth Street, in the city of Los Angeles. The alleged authorization was embodied in a letter, dated July 2, 1919, which is as follows:

"Los Angeles, California, July 2nd, 1919.
"Metcalf & Ryan, Agents,
   "626 South Spring Street, City.
"Gentlemen:

"Referring to our property at the southwest corner of Grand avenue and 6th street, this city, said property having a frontage of approximately 95 feet on West 6th street and running south to a depth of approximately 115 feet on Grand avenue, we desire to enter into a ground lease on said property. Therefore, we hereby give and grant to you for a period up to and including August 5th, 1919, the sole and exclusive right to act as our agents, and we request you to secure for us an acceptance of a lessee's right for a ground lease on said property.

"Provided you do secure for us such acceptance, it is understood and agreed that a lease will be at once executed after such acceptance and said lease shall be drawn in the usual form of ground lease as executed on Los Angeles property of this character; and the following, in so far as the intent and design is apparent, shall become a part of the terms and conditions in said lease:

"It is understood and agreed that the property is now subject to an encumbrance of thirty-five thousand ($35,000) dollars; this said encumbrance the lessee must pay to us as a bonus coincident with the execution of the lease.

"Lease to be for a period of 99 years from and after January 1st, 1920; lessee to pay as rental the sum of one thousand ($1000) dollars per month for each month of said term. The lessee to pay, in addition to the said rental, all taxes, assessments or liens that may be levied against the property during the period of the lease, with the exception of any income, personal property, or inheritance tax or charge, which shall be paid by us; lessee also to pay all insurance charges of any description, it being the spirit of this agreement that rental shall be net to us and that we shall not be called upon to pay any charges of any nature whatsoever levied against the property, with the exception of those certain taxes or charges above mentioned.

"Lessee shall carry fire insurance in responsible fire companies, approved by lessor, to the extent of at least 40% of the cost of improvement to be erected by lessee; also, lessee shall carry an amount of accident, casualty and employee's and other liability insurance as will reasonably and continuously protect both lessor and lessee from liability, or from loss or from damage to any person or property through any occurrence relating to the lessee's leasehold on the ground or in the buildings now or at any other time on said ground.

"The non-payment of rent or insurance after 30 days' written notice has been given by the lessor shall constitute the breaking of a covenant of said lease and the lessor may then have the right to enter the premises, take possession thereof and declare the said lease forfeited; provided, however, that the lessee may at any time within 60 days after such forfeiture pay up all back rent and insurance charges with interest on same at the rate of ten per cent per annum and shall then have the right to resume full possession of the said premises just as though no such forfeiture had occurred.

"The non-payment of taxes, assessments or any other charges after 30 days' written notice has been given by the lessor shall constitute the breaking of a covenant of said lease and the lessor may then have the right to enter the premises, take possession thereof and declare the said lease forfeited; provided, however, that the lessee may at any time within six months after such forfeiture, pay up all such unpaid taxes, assessments or other unpaid charges of any kind with interest on same at the rate of ten percent per annum and shall then have the right to resume full possession of the said premises just as though no such forfeiture had occurred.

"It is to be understood and agreed that, within five (5) years after January 1st, 1920, the lessee will commence the erection, on said property, of a Class A building costing not less than $150,000; such building to be fully completed within one year from the date of beginning construction and to be clear of any levy or lien or encumbrance whatsoever that would in any way become or be regarded as a lien or encumbrance against the real property.

"It is understood and agreed that coincident with the execution of a ground lease by the lessor and lessee, the lessee will provide lessor with a good and sufficient bond in the sum of $50,000, said bond being signed by a surety or sureties who would be and will be approved by Security Trust & Savings Bank of Los Angeles, California, as being a good and reasonable surety or sureties for such amount. Said bond shall remain in full force and effect until said building, as above provided, shall have been fully completed and free from any encumbrance, that would *effect* the title of lessors.

"The lessee may have the right to sell, assign or transfer his right in said lease, but by so doing, it shall not relieve the lessee of his full responsibilty under the terms of the lease until the $150,000 building above mentioned shall have been erected according to the terms of the lease. After said building shall have been fully completed, and free and clear of any lien or encumbrance that would *effect* the title of the lessor, the lessee may assign or sell his interest in said lease and thereafter be relieved of all liability under the terms of said lease.

"It is understood and agreed that the lessor will deliver the said property to the lessee on or before the said January 1st, 1920, free and clear of all encumbrances except an encumbrance in favor of the city of Los Angeles for the widening of West 6th street; this encumbrance lessee shall assume. Also, a certain lease expiring not later than January 1st, 1921, on the corner store room, which lease, however, can be bought from the tenant by payment of one thousand ($1000) dollars.

"Provided that you do secure, on or before the said August 5th, 1919, such acceptance as above described, we agree to pay you as commission and compensation for your services in having secured such acceptance, the sum of seven thousand ($7000) dollars, said sum payable upon the execution of said lease.

"Provided that, on or before the said August 5th, 1919, you have not secured such acceptance as above provided, and provided that you pay to us the sum of two hundred fifty ($250) dollars, then, in such event, we agree that you may have an additional period in which to secure for us

such acceptance, said additional period to extend up to and including September 10th, 1919. Provided that you do secure such acceptance on or before the said September 10th, 1919, then in such event, you are to be paid the commission and compensation as above provided and in the same manner, and also, the sum of two hundred fifty ($250) dollars paid to us shall be repaid to you.

> "Yours truly,
>> "V. W. GUERCIO,
>> "JOHN MENAGH."

The term of the authorization extended to August 5, 1919, but extensions were regularly issued extending the time to September 17, 1919. On the latter date the plaintiffs advised the defendants by letter that they had procured an acceptance by James E. Crawford. On the next day the defendants wrote to the plaintiffs asking them to draw a lease and submit the lease to the defendants for approval On the fifth day of March, 1920, the defendants leased the property to other parties and on October 5, 1920, this action was commenced.

[1] The appellants claim that during the term of the contract that they procured a lessee ready, able and willing to execute the lease and that they, therefore, earned their commission. At the outset they admitted that the trial court made findings of fact against them but they maintain that the findings of fact referred to are not sustained by the evidence.

On the trial of the case the plaintiffs called as a witness Mr. Crawford. He testified that he is a partner of the plaintiffs in the insurance business. He was shown a paper which was evidently the above letter written by the defendants, dated July 2, 1919, and testified that he signed the acceptance attached thereto. Continuing he stated: "I intended to accept the lease there described. At that time I stated in my acceptance that when the lease was executed I would sign and transfer the same. I had in mind Lee A. Phillips or a group of men of which Lee A. Phillips would be the nucleus as the persons to whom I intended to assign the lease." On cross-examination the witness testified that, acting upon the request of Mr. Ryan, he signed a letter dated September 17, 1919, and also a letter dated

March 13, 1920. "At the time I signed the acceptance there was no stipulated sum that I was to get out of it. I might have gotten something out of it. I did not intend to put up my own money in the deal. I did not intend to go out and get a bond for $50,000. The money was to be provided by Mr. Phillips. I talked to Mr. Ryan; I did not talk to Mr. Phillips about it. My negotiations and conversations in the matter were altogether with Mr. Ryan. Personally I had no agreement with Mr. Phillips that he was going to put up the money. If Mr. Phillips had failed to put up the money I might have been able to get it. I had an agreement with Mr. Ryan that the money would be provided but Mr. Ryan signed no papers and none were signed by Mr. Phillips and myself. None were signed by anybody else to provide this money. I did not have that amount of money. The letter dated March 13, 1920, is the first demand I made that the lease should be drawn. I did not make any demand before that. Before January 1, 1920, Mr. Ryan did not ask me to make a demand that the lease be drawn. He did not at any time present to me a lease for my signature."

The plaintiffs also called as a witness Mr. Phillips. He testified: "I got my information from Frank Ryan that the owners would lease the property. He informed me of the terms on which the owners would lease. Exhibit A attached to the amended complaint looks like the paper they brought to me. I said, 'Get me as much time on this proposition as you can . . . I will put up $35,000 and take the lease provided you can handle it in a way that I will not be known in the transaction until such time as I have completed certain other transactions which you are handling for me.' I asked Mr. Ryan whether he had anyone in the office who would be willing to accept the lease and enter into it with the understanding that I would take the responsibility of paying the $35,000 and carrying out the terms of the lease and supplying the bond. Mr. Ryan said that Mr. Crawford whom I had met in their office was willing to carry out the acceptance under the terms of the contract and that I could thoroughly rely upon him and that they would have the proper arrangements made as soon as executed and I agreed to that arrangement. At the time I had that conversation with Mr. Ryan and since

that time I had the actual money to pay the $35,000 and
I have many times this amount of good clear property that I
could have mortgaged so that there is no question about
that. The parties that would sign the bond would have
the credit at the Security Bank for many times the amount
provided in the bond. I was willing and able to provide
such a bond as security for Crawford if the lease were ac-
cepted by him." On cross-examination he testified: "I did
not sign a paper to the effect I would pay the $35,000 cash.
I did not sign any paper to the effect I would provide a
bond. I had $150,000 government bonds which I did not
want to sell on the then market and that is one reason
for my desiring delay on this. There has never been any
writing between Metcalf and Ryan and Crawford and my-
self in regard to any of our business transactions including
this particular transaction."

Mr. John F. Calhoun, manager in the office of the plain-
tiffs, testified that on September 17, 1919, he heard a con-
versation between Mr. Ryan and Mr. Guercio in which
Mr. Ryan stated to Mr. Guercio that in this transaction
Crawford represented other people.

The foregoing testimony is in the record as uncontra-
dicted. It is perfectly clear that not Mr. Crawford but
Mr. Phillips was principal.

Looking at Mr. Phillips as the principal, the record dis-
closes that he never entered into any enforceable contract
whereby he became bound to enter into a contract as lessee,
or that he became lessee, or that he authorized Crawford,
as his agent, to do so.

If the trial court believed the testimony of Mr. Calhoun,
and in support of the judgment we are bound to assume
that it did, then the trial court reached the conclusion that
Crawford in all things was acting as agent and as the testi-
mony subsequently disclosed that he was acting as the
agent of Phillips and his associates, principals unknown to
defendants. But, taking this view of the facts, there was
no writing executed by Phillips authorizing Crawford to do
anything whatever. (*Standard Live Stock Company* v.
*Bank of California*, 67 Cal. 381 [227 Pac. 962]; *Garcia
& Maggini Co.* v. *Colvin*, 53 Cal. App. 79 [199 Pac. 1113].)
When thereafter the plaintiffs asserted a claim to com-
missions they had not made any showing that they had

brought the lessor and lessee to an agreement or that an agreement had been executed which could be enforced by Phillips and his associates, or by the defendants against Phillips and his associates. (*Gunn* v. *Bank of California,* 99 Cal. 349 [33 Pac. 1105].) There is nothing in the record therefore that indicates that the findings are not sustained by the evidence.

[2] The appellants contend that the letter written by the defendants on September 18, 1919, was, in legal effect, an acceptance of Crawford as lessee and that the defendants are estopped thereafter asserting that Crawford was not ready, able and willing to execute the lease. To that contention there are two answers. One answer is that according to the testimony of Mr. Calhoun all parties knew that Crawford was not to be lessee. The other answer is that the point was not presented in the trial court because no objection whatever was made to the evidence which was adduced, but both parties proceeded to introduce evidence to the effect that Crawford was or was not ready, able and willing to execute the lease, and that he executed the purported contract as the agent of an undisclosed principal.

The judgment is affirmed.

Langdon, P. J., and Nourse, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 16, 1925.

Myers, C. J., dissented.